KRAUSE and wife, Appellants, vs. REICHEL, Respondent.

*April 5—April 30, 1918.*

*Contracts: Rescission: Fraud: Sale of non-existent "good will" and "business:" Procuring appointment to agency: Discharge through appointee's fault: Entire contract: Inadequacy of consideration: Married women: Separate property: Mortgage to secure husband's debt.*

1. In an action by K. and wife to set aside on the ground of fraud a mortgage given by the wife on her separate property to secure a part of the purchase price which K. had agreed to pay for the equipment used by defendant as a distributing agent for an oil company and for the "good will" of the business when the defendant procured the appointment of K. as his successor in the agency, findings by the trial court negativing fraud on the part of the defendant are *held* to be supported by the evidence, which shows, among other things, that K. knew that the agent was subject to discharge at any time by the company and that there was no "good will" or "business" which would exist after such

discharge; that plaintiffs fully understood the contract with defendant; and that no claim of fraud was made until, a few months after his appointment to the agency, K. was discharged through his own fault.

2. The fact that in procuring the appointment of K. the defendant concealed his interest in the matter from the manager of the oil company, who testified that if he had known of such interest he would not have accepted defendant's recommendation, does not affect plaintiffs' rights, they having obtained the property and the agency contracted for, and the agency having been lost wholly through the fault of the plaintiff K.

3. Since the plaintiffs paid or agreed to pay a gross sum for the equipment and for the procurement of the agency and it cannot be said that any definite part of that sum was for the one thing or the other, the contract is not separable.

4. Even if the equipment and the procurement of the agency, taken together, were an inadequate consideration for the payment to be made by plaintiffs, that fact alone is not a fatal defect or cause for rescission where, as in this case, the inadequacy is not so gross as, of itself, to prove fraud.

5. A married woman may give a valid mortgage on her own property in payment of or as security for her husband's debt.

ESCHWEILER, J., dissents.

APPEAL from a judgment of the circuit court for Oconto county: W. B. QUINLAN, Circuit Judge. *Affirmed.*

Action in equity by husband and wife to set aside, on the ground of fraud, a mortgage of $2,000 upon the wife's separate property, given to secure the payment of $2,000, being a part of the consideration which her husband had agreed to pay to the defendant by the written contract hereinafter set forth.

The principal facts may be briefly stated as follows: The defendant, *Reichel,* was for some years prior to May 25, 1915, the distributing agent of the Standard Oil Company at Shawano, Wisconsin, and vicinity, owning an equipment of horses, wagon, sleigh, etc., used in the business, worth about $1,000. He received a commission on all sales made and was subject to discharge at any time at the pleasure of the company. His gross receipts were about $2,600 to $2,700 a year,

out of which the expenses of keeping the horses had to be taken, the repairs on the outfit being defrayed by the company.  *Reichel* and *Krause* had been friends for years, and there had been talk between them about *Reichel* getting *Krause* a job.    *Krause* had accompanied *Reichel* on some business trips and had some knowledge of the business. *Reichel* wished to retire from the agency in May, 1915, and suggested to *Krause* and his wife that they buy him out, *i. e.* buy the equipment, and he (*Reichel*) would exert his influence with the Standard Oil Company to get him (*Krause*) appointed agent in his place.    *Reichel* proposed that *Krause* pay him $5,000 for the equipment and "the business."    Both parties had the idea, apparently, that *Reichel* really had a good will or a business to sell.    As matter of fact he had no "good will" in the legal sense, nor did he have a business to sell: he could be discharged at any time if he did not give satisfaction, and *Krause* knew this fact and knew that he himself would be in the same position if he were appointed agent.    So while both parties talked about the good will and the business and about the transfer of it from *Reichel* to *Krause,* both parties knew the fact that there was no "good will" or business which would exist for a day after the Standard Oil Company chose to terminate the agency.    *Reichel* stated to *Krause* what his receipts were, no inquiry was made as to the amount of the expenses, nor does that amount appear in the evidence.    *Reichel* cautioned *Krause* to say nothing about the deal to others, and the parties finally agreed on $3,000 as the price of the property and "the business" as they called it, *i. e.* the procuring of the agency by *Reichel* for *Krause,* and had a written contract drawn embodying the agreement.    This contract, after reciting *Reichel's* agency and equipment and the fact that *Krause* desires to purchase the equipment, the good will of the business, and secure the agency, provides that, in consideration of $3,000, to be paid $500 in cash, $500 in a seven-months note secured by chattel

mortgage on the equipment, and $2,000 in notes payable at specified times in the future, secured by mortgage on certain described property (the same being the mortgage in contro-versy here), *Reichel* sells and conveys to *Krause* the equipment and the good will of the business, and agrees not to go into the business of selling oil in Shawano or vicinity as long as *Krause* remains in the business.    The contract further states that no representations or warranties about the business, property, or income have been made except those set out in the contract and that the average *gross* income of the business for the immediately preceding year has been $220 a month.    The contract further provides that if *Reichel* should be unable to obtain the agency after exercising due diligence to do so, the contract should be void, but that the contract should not in any manner be contingent upon the ability of *Krause* to keep the agency.    This contract was executed by *Reichel* and *Krause, Mrs. Krause* being present at the time. *Reichel* immediately went to Milwaukee to see Mr. Nichols, the manager of the Oil Company, who had charge of the territory in question, and recommended *Mr. Krause* for appointment in his place.    Nichols wanted to see *Krause,* and *Reichel* returned to Shawano and went back to Milwaukee with *Krause.*    The result of the second interview was that *Krause* was appointed, and the deal between *Reichel* and *Krause* was closed and the mortgage in question executed and delivered.    *Reichel* said nothing to Nichols about his arrangement with *Krause,* and Nichols testified that if the company had known of this contract they would not have taken *Reichel's* advice.    *Krause* took over the equipment and the business about June 1st.    His gross monthly commissions on the average considerably exceeded the amount named in the written contract.    Four months after the transfer *Krause* paid *Reichel* $150 to apply on the $500 note.    *Krause* was discharged at the end of October because he was short in his accounts.    The trial court made findings of fact negativing

all claims of fraud or misrepresentation on the part of *Reichel,* and finding that both *Krause* and his wife knew what they were buying, understood the business, and received all they bargained for. Judgment dismissing the complaint and affirming the validity of the notes and mortgage in question was rendered, and the plaintiffs appeal.

For the appellants there was a brief by *Dillett & Winter* of Shawano, and oral argument by *P. H. Martin* of Green Bay.

For the respondent the cause was submitted on the brief of *D. G. Classon* of Oconto.

WINSLOW, C. J.    There was sufficient evidence to support the findings of fact of the trial court negativing fraud on the part of *Reichel.* The statement in the written agreement that there have been "no representations, warranties, or guaranties with reference to said business, property, or otherwise, or the income therefrom, except those herein fully set out," except that the average gross income of the business for the year has been $220 a month, may not perhaps be conclusive on the plaintiffs, but it is certainly of much weight when it is remembered that the plaintiffs were *sui juris,* of average intelligence and brightness, and that the contract was read over to them and explained to them before signature, and that they made no claim of any deception or fraud until they had, through their own fault, lost the business.

It appears by the testimony of the general agent, Mr. Nichols, that he would not have accepted *Reichel's* advice as to the appointment of *Krause* as his successor had he known that *Reichel* had attempted to sell the business by his contract with *Krause,* and the fact that *Reichel* concealed the attempted sale from Nichols is much relied on as a fraud upon *Krause* and his wife. We are not able to see, however, that this fact in any way concerns the plaintiffs or affects their rights. They received just what they bargained for and knew they were bargaining for. They lost the agency, not

by reason of any act of *Reichel's,* but by reason of their own inefficiency or worse in the conduct of the business. There is no proof or intimation that the company would have discharged *Krause* so long as he was rendering faithful and satisfactory service, even had the prior contract with *Reichel* been discovered after he had entered on his work. *Reichel's* lack of candor and frankness with the company does not seem to have in any way affected the situation or the plaintiffs' rights at any time. Practically the only complaints the plaintiffs now have to make in their testimony is that *Reichel* had in fact no business to sell and that he ought to have told them that *Krause* would not be able to transact the business and hold the job. As we have seen, all the parties understood that *Krause* could be discharged at any time if his work was not satisfactory, and, knowing this, they necessarily knew that there was no "business," in the ordinary sense of the word, to sell. As to the second contention just named, the fact seems clear that *Krause* had full information as to the nature of the business and the demands which it made on business capacity.

It may well be that the plaintiffs made a poor bargain, indeed this seems fairly well proven, but they made it with their eyes open and were not defrauded. They paid or agreed to pay a gross sum for the personal property and for the effort of *Reichel* to procure the agency for them. It cannot be said that they paid any definite part of the consideration for this effort or influence and another definite part for the personal property; in other words, the contract is not separable. There was a tangible consideration (*i. e.* the equipment) and an intangible one, namely, the successful exertion of influence to obtain the agency for *Krause.* Taken together they may be inadequate, but mere inadequacy of consideration alone is not a fatal defect or cause for rescission unless the inadequacy be so gross as to prove fraud by its very inadequacy under the circumstances, and we cannot

say that the present is such a case.    *Rust v. Fitzhugh,* 132
Wis. 549, 112 N. W. 508.

It was entirely competent for *Mrs. Krause* to give a valid
mortgage on her own property in payment of or as security
for her husband's debt.    *Fitzgerald v. Dunn,* 112 Wis. 37,
87 N. W. 803.

*By the Court.*—Judgment affirmed.

The following opinion was filed May 20, 1918:

ESCHWEILER, J. (*dissenting*).    By the defendant's own
testimony he considered the personal property worth about
$1,000 and the business worth $2,000.    The sale for $3,000
by defendant was to plaintiff *Charles Krause* only, and not to
*Lydia Krause.*    Two thousand dollars is also just the amount
of the mortgage given by the plaintiff *Lydia* on her separate
property, and which mortgage she seeks to have canceled in
this action.    The $2,000 of the $3,000 purchase price,
plainly separable under the admissions of the defendant and
therefore binding as such against him, whether the parties so
specified in the contract or not, was of no value whatsoever
unless and except the Standard Oil Company would consent
to take plaintiff *Charles Krause* as its agent in place of de-
fendant.    *Reichel* recommended *Charles Krause* to the
Standard Oil Company as a proper successor, but in doing so
concealed from that company the fact that it was to his finan-
cial interest to the extent of $2,000 to have the contract given
to *Krause.*    He was expressly asked for information on that
precise point and made a material false statement in answer.
There is no escape from the conclusion, under the testimony,
that if he had been truthful the agency would not have been
given to the plaintiff *Charles Krause,* and the plaintiff *Lydia
Krause* would have saved her separate property.

If defendant *Reichel* were suing for this $2,000 as being
unpaid on the agreed purchase price and the same facts were
disclosed as here, I think the court would have been bound

to have denied him relief, as he, in order to maintain his right to secure his $2,000, would have to show his own wilful deceit in connection with and as a part of the transaction and without which deceit the condition requisite to his right to recover would not have come into existence. *Sauerhering v. Rueping,* 137 Wis. 407, 412, 119 N. W. 184; *Holcomb v. Weaver,* 136 Mass. 265; *Harrington v. Victoria G. D. Co.* L. R. 3 Q. B. D. 549.

I think it follows as a necessary consequence that the plaintiff *Lydia Krause* was entitled to have the $2,000 mortgage executed by her canceled.